1  STEPHANIE YONEKURA
   Acting United States Attorney
2  ROBERT E. DUGDALE
   Assistant United States Attorney
3  Chief, Criminal Division
   ANTHONY J. LEWIS (Cal. Bar No. 231825)
4  AARON LEWIS (Cal. Bar No. 284244)
   Assistant United States Attorneys
5  National Security Section
        1300 United States Courthouse
6       312 North Spring Street
        Los Angeles, California 90012
7       Telephone: (213) 894-1786/4586
        Facsimile: (213) 894-6436
8       E-mail:    anthony.lewis@usdoj.gov
                   aaron.lewis@usdoj.gov
9
   Attorneys for Plaintiff
10 UNITED STATES OF AMERICA

11               UNITED STATES DISTRICT COURT

12          FOR THE CENTRAL DISTRICT OF CALIFORNIA

13 UNITED STATES OF AMERICA,        No.  SA 14-320M

14            Plaintiff,            GOVERNMENT'S BRIEF IN SUPPORT OF
                                    REQUEST FOR DETENTION OF DEFENDANT
15            v.                    KEITH PRESTON GARTENLAUB;
                                    DECLARATION OF ALEX YOO
16 KEITH PRESTON GARTENLAUB,

17            Defendant.

18

19      Plaintiff United States of America, by and through its counsel

20 of record, the Office of the United States Attorney for the Central

21 District of California and Assistant United States Attorneys Anthony

22 J. Lewis and Aaron Lewis, hereby files the Government's Brief in

23 Support of Request for Detention of Defendant Keith Preston

24 Gartenlaub (the "Detention Brief").

25 ///

26

27

28

FILED-SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

AUG 2 7 2014

CENTRAL DISTRICT OF CALIFORNIA
BY                      DEPUTY

1     This Detention Brief is based upon the attached memorandum of

2 points and authorities, the declaration of Alex Yoo, the files and

3 records in this case, and such further evidence and argument as the

4 Court may permit.

5 Dated: August **27**, 2014        Respectfully submitted,

6        STEPHANIE YONEKURA
       Acting United States Attorney

7

8        ROBERT E. DUGDALE
       Assistant United States Attorney
       Chief, Criminal Division

9

10

11        ANTHONY J. LEWIS
       AARON LEWIS
       Assistant United States Attorneys

12

13        Attorneys for Plaintiff
       UNITED STATES OF AMERICA

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

DESCRIPTION                                                                    PAGE

TABLE OF AUTHORITIES ................................................ ii

MEMORANDUM OF POINTS AND AUTHORITIES ................................ 1

I.    INTRODUCTION .................................................. 1

II.   STATEMENT OF FACTS ........................................... 2

III.  ARGUMENT ..................................................... 4

      A.   The Bail Reform Act ..................................... 4

      B.   Pretrial Detention is Warranted Under the § 3142(g)
           Factors ................................................ 5

           1.   The Nature and Circumstances of the Offense
                Charged ........................................... 5

           2.   The Weight of the Evidence ........................ 7

           3.   The History and Characteristics of Defendant ...... 8

           4.   The Nature and Seriousness of the Danger Posed by
                Defendant's Release ............................... 11

IV.   CONCLUSION ................................................... 12

1

**TABLE OF AUTHORITIES**

2

DESCRIPTION                                                        PAGE

3

**FEDERAL CASES**

4

Osborne v. Ohio,
    495 U.S. 103, 110 S. Ct. 1691, 109 L. Ed. 2d 98 (1990) ....... 5

5

United States v. Boos,
    127 F.3d 1207 (9th Cir. 1997) ............................. 12

6

7

United States v. Hir,
    517 F.3d 1081 (9th Cir. 2008) ............................. 11

8

United States v. Koenig,
    912 F.2d 1190 (9th Cir. 1990) ........................... 9, 10

9

10

United States v. Motamedi,
    767 F.2d 1403 (9th Cir. 1985) ........................... 4, 5

11

United States v. Paroline,
    134 S.Ct. 1710 (2014) ..................................... 5

12

13

United States v. Trosper,
    809 F.2d 1107 (5th Cir. 1987) ........................... 9, 11

14

United States v. Winsor,
    785 F.2d 755 (9th Cir. 1986) ............................ 5, 8

15

16

**FEDERAL STATUTES**

17

18 U.S.C. § 2252A(a)(5)(B) ............................... 1, 5, 7

18

18 U.S.C. § 3142 ...................................... 1, 4, 5, 12

19

20

21

22

23

24

25

26

27

28

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

**I.   INTRODUCTION**

3    On August 27, 2014, Special Agents of the Federal Bureau of

4  Investigation arrested Keith Preston Gartenlaub ("defendant") for

5  possession of child pornography in violation of 18 U.S.C.

6  § 2252A(a)(5)(B).  Because there is no condition or combination of

7  conditions that would mitigate the significant risk that defendant

8  will flee the United States rather than face trial, this Court should

9  grant the government's request for pre-trial detention under 18

10  U.S.C. § 3142.

11    As described more fully below, defendant has a powerful motive

12  to flee the United States rather than face trial.  He also has the

13  relationships, knowledge, and means to do so successfully.

14  Defendant's wife was born in China, and her family, which defendant

15  has described as "well connected," continues to live there.  Until

16  recently, defendant and his wife also owned real property in China

17  and had since 2008.  They have been in telephone contact with

18  telephone numbers registered in China and defendant has traveled to

19  China—a nation that does not have an extradition treaty with the

20  United States—three times this year alone.  Defendant has few

21  remaining ties to this community.  His employment in this District

22  will likely be terminated, he now owns no property in the Central

23  District of California, and his lease is scheduled to expire at the

24  end of October.

25    In addition to defendant's connections to China, he also has the

26  financial means to flee and sustain himself.  Defendant converted

27  more than $200,000 of the proceeds from the sale of his home in

28  February 2014 to a cashier's check in his wife's name.  In 2008,

1  defendant used $30,000 of his retirement account to purchase real

2  estate in China, property that he recently sold.

3       Viewed in light of the applicable sentencing range if defendant

4  were convicted—108 to 135 months—these facts demonstrate that

5  defendant has the capacity to flee, that he could live abroad

6  indefinitely, and that there is no combination of pre-trial release

7  conditions that would reasonably assure defendant's presence at

8  future proceedings. Pretrial detention is required.

9  **II.   STATEMENT OF FACTS**

10      Defendant has been arrested and a complaint is being filed

11  charging defendant with possession of child pornography in violation

12  of Title 18, United States Code, Section 2252A(a)(5)(B).

13      As set forth in the Declaration of Alex Yoo ("Decl."),[1]

14  defendant possesses the means and incentive to flee:

15      • Defendant maintains fourteen bank accounts, with balances

16         totaling $34,624 (Decl. ¶ 2.);

---

[1]   The government may proceed by way of a proffer in a hearing on defendant's detention. E.g., Winsor, 785 F.2d at 757 (ruling that without a proffer from defendant as to why the government's proffer was incorrect, "the magistrate was not required to allow Winsor to cross-examine the investigators and police officers"); United States v. Cabrera-Ortigoza, 196 F.R.D. 571 (S.D. Cal. 2000) (ruling government may proceed based on proffer without a counter-proffer from defendant in "reasonable detail" and "credibly challenging the correctness of the government's proffer"); see also United States v. Bibbs, 488 F. Supp. 2d 925, 926 (N.D. Cal. 2007) ("Nothing in Crawford requires or even suggests that it be applied to a detention hearing under the Bail Reform Act, which has never been considered to be part of the trial."). Here, the government has submitted a sworn declaration, which contains hearsay that can be considered by the Court in a hearing to determine if defendant should be detained. Fed. R. Evid. 1101(d)(e) (providing that the Federal Rules of Evidence "do not apply to . . . miscellaneous hearings such as . . . considering whether to release on bail or otherwise"); Winsor, 785 F.2d at 757 ("[T]he government may proceed in a detention hearing by proffer or hearsay.").

- Defendant sold his residence, the real estate where he and his wife lived, in February 2014, and subsequently transferred $200,000 of the proceeds from that sale into a cashier's check in his wife's name that she deposited. (Decl. ¶¶ 6-7.);

- Defendant previously used $30,000 from his retirement account to fund the purchase of an apartment in China with his wife. (Decl. ¶ 9.);

- Defendant has since sold that real estate, purchased other real property in China, and has recently sold that real estate as well. (Decl. ¶ 12.);

- Defendant has traveled to China at least six times since 2006, and has traveled elsewhere abroad. (Decl. ¶ 14.);

- Defendant characterized his wife's family in China as being well-connected. (Decl. ¶ 11.a.);

- Defendant and his wife have been in contact dozens of times with telephone numbers based in China. (Decl. ¶ 16.);

- Defendant's wife has deposited $38,084 in cash in to a bank account associated with her business between July 2, 2013 and February 26, 2014 (Decl. ¶ 3.);

- Defendant has a brother and father, neither of whom resides in the Central District of California. (Decl. ¶ 17);

- Defendant and his wife now live in a temporary rental that they have rented through October 2014. (Decl. ¶ 18); and

- Defendant has currently been seeking other employment abroad in Shanghai. (Decl. ¶¶ 19-21.).

1  **III. ARGUMENT**

2      **A.   The Bail Reform Act**

3      Under the Bail Reform Act of 1984 ("the Act") this Court may

4  order defendant's pretrial detention if the Court determines that "no

5  condition or combination of conditions will reasonably assure the

6  appearance of the [defendant] as required and the safety of any other

7  person and the community."  18 U.S.C. § 3142(e).  In this case, the

8  government seeks defendant's pre-trial detention solely because he is

9  a significant flight risk and no combination of release conditions

10 will reasonably assure his appearance at future proceedings in this

11 case.  The government acknowledges that there are pre-trial release

12 conditions that would "reasonably assure . . . the safety of any

13 other person and the community," and therefore is not seeking to

14 detain defendant as a danger to the community.  Detention is

15 appropriate in this case if the government proves by a preponderance

16 of the evidence that defendant is a flight risk.  United States v.

17 Motamedi, 767 F.2d 1403, 1406 (9th Cir. 1985).

18     The government is entitled to a hearing on this issue if, as in

19 this case, the government requests a hearing and the case involves

20 "any felony that is not otherwise a crime of violence that involves a

21 minor victim," or "a serious risk that [the defendant] will flee."

22 18 U.S.C. §§ 3142(f)(1)(E), (2)(A).  Four factors are relevant to the

23 Court's consideration of whether pretrial detention is appropriate:

24 (1) the nature and seriousness of the offense charged, under 18

25 U.S.C. § 3142(g)(1); (2) the weight of the evidence against

26 defendant, under 18 U.S.C. § 3142(g)(2); (3) the defendant's history

27 and characteristics, under 18 U.S.C. § 3142(g)(3); and, (4) the

28 nature and seriousness of the danger to any person or to the

1    community that would be posed by the defendant's release, under 18

2    U.S.C. § 3142(g)(4).   See United States v. Winsor, 785 F.2d 755 (9th

3    Cir. 1986); Motamedi, 767 F.2d at 1407.

4         **B.    Pretrial Detention is Warranted Under the § 3142(g) Factors**

5         Each of the factors enumerated in 18 U.S.C. § 3142(g) supports

6    the government's request for pretrial detention.

7              1.   The Nature and Circumstances of the Offense Charged

8         The United States has charged defendant with possession of child

9    pornography, in violation of 18 U.S.C § 2252(A)(a)(5)(B).   The nature

10   and circumstances of this offense warrant defendant's pre-trial

11   detention to reasonably assure his appearance at future proceedings

12   in this case.   This is particularly so because defendant's possession

13   of child pornography necessarily involved minor victims, a category

14   of criminal conduct expressly referenced in 18 U.S.C. § 3142(g)(1),

15   and, as the Supreme Court recently recognized, encouraged the

16   production of child pornography:

17        The demand for child pornography harms children in part
          because it drives production, which involves child abuse.
18        The harms caused by child pornography, however, are still
          more extensive because child pornography is "a permanent
19        record" of the depicted child's abuse, and "the harm to the
          child is exacerbated by [its] circulation."   Because child
20        pornography is now traded with ease on the Internet, "the
          number of still images and videos memorializing the sexual
21        assault and other sexual exploitation of children, many
          very young in age, has grown exponentially."
22

23   United States v. Paroline, 134 S.Ct. 1710, 1716-17 (2014).   The

24   charged offense necessarily encourages the continued sexual abuse of

25   children, thereby perpetuating their suffering.   See Osborne v. Ohio,

26   495 U.S. 103, 11, 110 S. Ct. 1691, 109 L. Ed. 2d 98 (1990) ("The

27   pornography's continued existence causes the child victims continuing

28   harm by haunting the children in years to come.   The . . . ban on

                                     5

possession . . . encourages the possessors of these materials to destroy them.") (citations omitted).  In light of the Supreme Court's recognition that simply possessing child pornography harms children by encouraging the production of child pornography, detention is warranted to ensure that defendant is unable to view, receive, or transmit additional child pornography pending trial.  Moreover, the inherently serious nature of the charged offense, as well as the likely consequences of a conviction on defendant's relationships with his friends, colleagues, and family, produces a powerful incentive for defendant to flee the United States to China.  So too does the lengthy custodial sentence defendant would face if convicted.

Based on the facts alleged in the criminal complaint, defendant faces a sentencing range of 108-135 months based on an adjusted offense level of 31 and a criminal history category of I, calculated using the following provisions of the Sentencing Guidelines:

| | | | |
|---|---|---|---|
| Base Offense Level: | 18 | [U.S.S.G. § 2G2.2(a)(1)] |
| Specific Offense Characteristics | | | |
| Prepubescent Minors: | +2 | [U.S.S.G. § 2G2.2(b)(2)] |
| Sadistic Material: | +4 | [U.S.S.G. § 2G2.2(b)(4)] |
| Use of a Computer: | +2 | [U.S.S.G. § 2G2.2(b)(6)] |
| More than 600 images: | +5 | [U.S.S.G. § 2G2.2(b)(7)(D)] |

Using just the low-end of the likely applicable Guidelines range, defendant thus faces an approximately nine-year term of incarceration upon conviction.  The length of this sentence produces an additional powerful motivation for defendant to flee, particularly to China a nation that does not have an extradition relationship with the United States.  Given the serious nature of the charged offense, the likely penalty, and the vital importance of preventing additional

1  consumption of child pornography by defendant, pre-trial detention is

2  warranted.

3          2.   The Weight of the Evidence

4      The evidence of defendant's guilt is all but overwhelming.  As

5  described more fully in the criminal complaint, the government has

6  copies of the child pornography stored on two of defendant's

7  computers.  The evidence contained in these copies proves each of the

8  elements that compose the charged offense.[2]  The government has

9  already determined that some of the videos in defendant's collection

10  contained images of identified minor victims, and that the video

11  files containing these depictions must have traveled in interstate or

12  foreign commerce in order to be found on hard drives located in the

13  Central District of California.  (Complaint Affidavit ¶¶ 10-12).

14  Moreover, some of the videos in defendant's collection depict

15  children under ten years of age being raped by adult men, leaving no

16  doubt either that defendant knew that these depictions showed minors

17  engaged in sexually explicit conduct or that the production of these

18  videos involved the use of a minor in sexually explicit conduct.

19  (Complaint Affidavit ¶¶ 10.a-h).

20   

---

21      [2] The elements of possession of child pornography in violation
of 18 U.S.C. § 2252(A)(a)(5)(B) are:  (1) defendant knowingly

22  possessed matters which the defendant knew contained visual
depictions of minors engaged in sexually explicit conduct;

23  (2) defendant knew each visual depiction contained in the matters
showed minors engaged in sexually explicit conduct; (3) defendant

24  knew that production of such visual depictions involved use of a
minor in sexually explicit conduct; and, (4) each visual depiction

25  had been either (a) mailed, (b) shipped/transported using any means
or facility of interstate or foreign commerce or in or affecting

26  interstate and foreign commerce, by any means, including by computer,
or (c) produced using material that had been mailed or

27  shipped/transported in or affecting interstate or foreign commerce by
any means, including computer.  See Ninth Circuit Model Jury

28  Instruction 8.185 (2010 ed.)

1    Likewise, the evidence obtained by the government proves that

2   defendant knowingly possessed the collection of child pornography

3   stored on computers he used, computers that were found in his home.

4   In addition to child pornography, defendant also collected adult

5   pornography.  (Complaint Affidavit ¶¶ 25-27).  He stored these files

6   in folders that were buried deep within other folders, often within

7   folders that had names corresponding to their contents, indicating

8   that he had viewed them and therefore possessed them knowingly.

9   (Complaint ¶¶ 29-31).

10    Although the Ninth Circuit has held consistently that courts

11   should afford the least weight to this factor, see Winsor, 785 F.2d

12   at 757, here the strength of the government's proof amplifies the

13   risk that defendant will flee to avoid the likely consequences of

14   going to trial.  Consequently, the weight of the evidence warrants

15   defendant's pre-trial detention.

16        3.   The History and Characteristics of Defendant

17    Defendant's history and characteristics weigh heavily in favor

18   of pre-trial detention.  Although defendant has lived in the Central

19   District of California for many years, he has few concrete ties to

20   this community now.  Defendant's most significant personal

21   relationship is with his wife, a woman born in China who has

22   significant family ties to that country.  Indeed, defendant traveled

23   to China as recently as June of 2014.  This was the sixth trip that

24   defendant took to China since 2006.  In an interview with F.B.I.

25   special agents in February 2013, defendant described his wife's

26   family as "well-connected" in China.  Defendant and his wife have

27   placed a total of 86 calls to telephone numbers registered in China

28   between January 1, 2014 and August 21, 2014.

1     Neither do defendant's relationships with the members of his own

2    family tie him to this community.  Although defendant's brother and

3    father live in the United States, they reside in other districts and

4    there is no indication that they could ensure defendant's continued

5    presence in this country pending trial.  See United States v. Koenig,

6    912 F.2d 1190, 1193 (9th Cir. 1990) ("His parents have offered to put

7    up a bond, but there is reason to believe that his relationship with

8    his parents is not a close one and that the bond would not assure his

9    appearance."); United States v. Trosper, 809 F.2d 1107, 1110 (5th

10    Cir. 1987) (noting that family ties did not "demonstrate

11    relationships wherein the family members had some control, either

12    physical or emotional, over [defendant's] actions," nor that they

13    "could or would constrain [defendant's] appearance at trial").

14     Defendant's most significant link to this community was his

15    employment with a prominent corporation that has a longstanding

16    presence in this judicial district.  But defendant is not likely to

17    maintain his employment working on sensitive military matters having

18    been charged with a federal felony.  Even if defendant's employer

19    were willing to retain him, however, defendant has recently searched

20    for other employment, in Shangahi, suggesting that his current job is

21    not sufficiently important to prevent him from fleeing the United

22    States.

23     Similarly, there is no property interest in this judicial

24    district that would compel defendant to remain here and face the

25    charge pending against him.  Defendant no longer owns a home in this

26    judicial district, having sold the previous residence that he shared

27    with his wife in February 2014.  Until his arrest, defendant and his

28    wife lived in a house that they rented; the lease is scheduled to end

1  in October 2014.  Until recently, defendant and his wife did,

2  however, own an apartment in China.  According to a letter defendant

3  wrote in 2008, he and his wife jointly bought an apartment in

4  Kunshan, which he said was an investment property.  In the same

5  letter, defendant noted that his wife's family had purchased at least

6  one additional apartment in the same complex.  Although defendant

7  told F.B.I. agents on August 25, 2014, that he and his wife had

8  recently sold two properties in China with the intention of

9  purchasing a home in Southern California, defendant has a

10  demonstrated ability to purchase and dispose of property in China, an

11  ability that could aid his flight from the United States to avoid

12  prosecution.  Furthermore, the proceeds of that sale could sustain

13  defendant in his flight.

14       On balance there is far more tying defendant to China—a country

15  from which the United States could not extradite him—than there is

16  tying him to the United States.  Kouyoumdjian, 601 F. Supp. at 1512

17  ("[G]iven the state of affairs in Lebanon, extradition would likely

18  be impossible were defendant to flee.").  Moreover, defendant's

19  extensive contacts with China, including his "well-connected" in-laws

20  and his admitted purchases and sales of real property in China,

21  demonstrate that defendant has the capacity to do what few other

22  defendants can—flee the United States and live abroad indefinitely,

23  free from the risks of extradition, conviction, and incarceration.

24  See United States v. Koenig, 912 F.2d 1190, 1193 (9th Cir. 1990)

25  (relying in part on "foreign contacts" as basis for affirming

26  district court's order of detention).

27       In addition—critically—defendant has significant, liquid

28  assets in excess of $200,000 that he could use to flee the United

1    defendant's continued consumption of child pornography pending trial

2    would further harm the children depicted in the videos composing

3    defendant's collection.   The Ninth Circuit has explicitly recognized

4    that the victims of child pornography are the sexually exploited

5    children depicted in the images.   United States v. Boos, 127 F.3d

6    1207 (9th Cir. 1997).   In rejecting a defendant's argument that the

7    only victim of his child pornography trading was society in general,

8    the court found that the primary victims of defendant's criminal

9    conduct were the children depicted in the images:

10           After all it was the children depicted -- and not society
             at large -- who were acted on and adversely affected, who
11           oftentimes were forced to participate in the production of
             the pornography in which [defendant] traded, who were
12           injured (both physically and psychologically) as a result
             of [defendant]'s patronage of the porn industry, who were
13           sacrificed to satisfy [defendant]'s curiosities, who were
             subjected to the cruelest form of oppression, hardship, and
14           mistreatment at the hands of pornography producers and
             photographers, and whose lives were quite possibly
15           destroyed in the process.

16   Id. at 1210.   Although one of the factors under 18 U.S.C. § 3142(g),

17   the evidence set forth in the declaration and affidavit in support of

18   the complaint do not manifest an immediate danger in terms of the

19   library of child pornography possessed, but his creation and amassing

20   of it has clearly caused harm to the victims.

21           Regardless of the danger presented, for the reasons set forth

22   above, defendant has the means and incentive to flee, and his

23   appearance cannot be assured by any combination of conditions while

24   he is released.

25   IV.   CONCLUSION

26           For the foregoing reasons, the government respectfully requests

27   that this Court order defendant detained pending trial.

28

                                    12

1                       <u>DECLARATION OF ALEX S. YOO</u>

2       I, Alex S. Yoo, declare as follows:

3       1.   I am a Special Agent ("SA") with the Federal Bureau of

4 Investigation.  I have knowledge of the facts set forth herein and

5 could and would testify to those facts fully and truthfully if called

6 and sworn as a witness.

7      **A. Account Balances and Assets**

8       2.   I have reviewed records from Bank of America, First Bank,

9 JP Morgan Chase, Navy Federal Credit Union (Navy FCU), TD Ameritrade,

10 and USAA Bank, as well as a summary of those documents prepared by a

11 financial analyst, and have also discussed these records with another

12 Special Agent and with an FBI Staff Operations Specialist.  From

13 those sources, I learned that over the last six years, Keith

14 Gartenlaub (as a sole or joint accountholder), his wife, or her

15 business have maintained at least 23 bank accounts, certificates of

16 deposit, and investment accounts at financial institutions in the

17 United States.  Among those accounts that are still open are:

18         a.   Two Bank of America accounts with balances of

19 <u>$24,383.27</u> and <u>$2,730.20</u> respectively as of June 9, 2014, and one

20 Bank of America account with a balance of <u>$1,036.49</u> as of June 30,

21 2014.

22         b.   A First Bank account with a balance of <u>$3,641.23</u> as of

23 February 28, 2014.

24         c.   A TD Ameritrade account with a balance of <u>$2,832.85</u> as

25 of March 31, 2013.

26         d.   In addition to these accounts with a total balance of

27 <u>$34,624.04</u>, Gartenlaub also maintains at least nine more accounts

28

1   with balances between $0 and $513.89, which balances were current as

2   of dates between December 31, 2013 and June 9, 2014.  Gartenlaub was

3   also an accountholder on nine additional accounts maintained at these

4   institutions that have since been closed between 2008 and 2013.

5       3.   I have also reviewed JP Morgan Chase and First Bank records

6   associated with Gartenlaub's wife's business--which appears to offer

7   antiques for sale--and learned that a total of $38,084 was deposited

8   in cash between July 2, 2013 and February 26, 2014 in amounts ranging

9   from $20 to $9,045, including specifically cash deposits in the

10  amounts of $9,045, $9,000, $3,000, $2,000, $1,940, $1,200, and three

11  in the amount of $1,000.

12  **B. Inbound and Outbound Wire Transfers with China**

13      4.   I have also reviewed records related to those accounts and

14  to transfers processed by the Fedwire Funds Transfer System, which

15  maintains records of international wire transfers, as well as a

16  summary of those records prepared by a financial analyst.  From those

17  sources, I learned:

18      a.   On February 11, 2014, one of the accounts maintained

19  by Gartenlaub and his wife at First Bank received $9,988 from an

20  incoming wire that was sent from an identified person in Shanghai,

21  China, and the beneficiary was identified as the name of Gartenlaub's

22  wife's business that appears to sell antiques.  Although the

23  originating bank was not identified, the ABA routing number of the

24  sender was associated with Bank of China in New York, based on a

25  search of that routing number in publicly available records.

26      b.   On November 3, 2009, a wire transfer of $25,000 was

27  sent from the Bank of America account held by Gartenlaub and his

28

1   wife.   The beneficiary listed was Gartenlaub's wife at an account

2   maintained at Industrial and Commercial Bank of China ("ICBC").

3   Records and entries of subsequent transactions show this transfer was

4   reversed, potentially because the beneficiary's account number had

5   not been correctly entered, and two additional transfers in the

6   amounts of $15,000 and $10,000 were sent that also identified

7   Gartenlaub's wife as the beneficiary.   Above the line of the wire

8   record that identified Gartenlaub's wife as a beneficiary at ICBC

9   were special instructions that stated "VIP CUSTOMER."

10          c.   On August 26, 2009, one of the accounts maintained by

11   Gartenlaub and his wife at Bank of America received $4,982 from an

12   incoming wire transfer that originated from an identified person's

13   account at ICBC.   That transfer partially funded a much larger

14   cashier's check related to the purchase of Gartenlaub's prior

15   residence in Irvine, California.

16          d.   On September 11, 2008, Tess Gartenlaub wired $200 to

17   Shi Hai Yi of Shanghai China with no address listed.   The funds were

18   deposited into an account at ICBC.

19      5.   I have also reviewed e-mail correspondence obtained from an

20   e-mail search warrant showing that Gartenlaub's wife had been

21   attempting to wire funds from an account she maintained at East West

22   Bank to her mother in Shanghai in June 2007.

23      **C. Liquidation of Assets**

24      6.   I have also reviewed bank records provided by Bank of

25   America and the results of a database showing the purchase and sale

26   of real estate.   From those sources, I learned that on March 7, 2014,

27   the account maintained by Gartenlaub and his wife received

28

$246,146.91 that originated from an escrow company at the time when Gartenlaub and his wife sold their residence in Irvine in February 2014, which I learned was sold for over $600,000 and which had been burdened by a loan of over $400,000.

7.    Subsequently, on April 15, 2014, Gartenlaub's wife made a $200,000 withdrawal and purchased a Bank of America cashier's check made payable to herself in that amount.  On the same date, the Bank of America cashier's check was deposited into a savings account at Mega Bank.  I have not reviewed records showing whether the funds remained there or not.

    D.    **Gartenlaub's Family Connections and Sale of Real Estate in China**

8.    I have reviewed a "Questionnaire for National Security Positions" regarding Keith Gartenlaub that reports that Tess Gartenlaub was born in Shanghai, China.

9.    I have reviewed documentation that Gartenlaub submitted to his employer regarding the purpose of his travel and activities that occurred during his foreign travel.  In one such letter maintained by Gartenlaub's employer that appeared to be written by Gartenlaub, Gartenlaub reported that he traveled to China in June 2008 with his wife and that he and his wife completed the purchase of an apartment in Kunshan, China on which she had put a down payment before they were married.  Based on where this letter appeared among other records maintained by Gartenlaub's employer, the letter appeared to be written near that time.  Gartenlaub wrote that he had taken a loan of $30,000 out of his "401k account" in order to pay back his father, who had loaned the $30,000 to pay the cost for completing the purchase of the apartment.  According to the letter, the apartment

4

1  was initially in the name of Gartenlaub's wife's father and aunt due

2  to "residency requirements for purchasing property."  According to

3  the letter, the apartment was purchased for investment purposes,

4  Gartenlaub and his wife "have no firm long-term plans for this

5  property and are looking at it as an investment," and they planned to

6  renovate it, rent it out, and have it managed by Gartenlaub's wife's

7  family, who also bought property in the same complex.

8       10.  I have reviewed an e-mail that I learned from another FBI

9  agent was obtained pursuant to a search warrant.  That e-mail showed

10  that Gartenlaub wrote his wife with a subject line of "paperwork" and

11  asked his wife:  "Should we put in the China property as an asset

12  since we still have some payments left on the loan?"

13       11.  I have reviewed an FBI report of the interview of

14  Gartenlaub on February 22, 2013.  In that interview, Gartenlaub said

15  the following:

16         a.  Gartenlaub stated he never had to worry about his

17  security while traveling in China because his wife's family is "well

18  connected."

19         b.  Gartenlaub sought to travel to China because his wife

20  was Chinese, but his employer recommended that he not travel to China

21  anymore.

22       12.  I learned from an FBI agent who interviewed Gartenlaub on

23  August 25, 2014 that Gartenlaub said during the interview that he and

24  his wife had first purchased one piece of real estate in China, sold

25  it to purchase another, and that they had recently sold that second

26  piece of real estate in China.  Gartenlaub did not say how much he

27  had sold it for.

28

**E. Gartenlaub's Travel to and Telephone Contact with China**

13.  I have also reviewed a summary prepared by a security officer at Gartenlaub's employer in 2013.  According to that officer:

      a.    Gartenlaub would travel to China and visit family there.

      b.    Gartenlaub had said he "owned property in China (an apartment, as I recall)."

      c.    Gartenlaub "always felt he was above the rules."

      d.    Gartenlaub had been instructed not to travel to China in one particular instance, and had initially said he already bought tickets and was going to go anyway.  Gartenlaub ultimately said he did not travel to China on that instance.  (Based on my review of the travel records and my communications with a Staff Operations Specialist described below, I am not aware of evidence indicating that Gartenlaub traveled to China on that instance.)

14.  I have reviewed a summary prepared by a Staff Operations Specialist of a government database that records when persons cross the United States border, records maintained by Gartenlaub's employer of Gartenlaub's travel, e-mail messages obtained from a search warrant relating to certain trips Gartenlaub had taken, and a list of travel based on those sources prepared by an analyst.  Those records show Gartenlaub has consistently traveled abroad, and often to China. Although sometimes the records maintained in the database only show the immediate airport to which Gartenlaub departed or from which he returned, some of those entries correspond to Gartenlaub's wife's travel or evidence from other sources identified above; for example, in October 2009, database records show Gartenlaub departed for Tokyo,

and returned from Seoul, Republic of Korea, but the database records for Gartenlaub's wife show that she had departed the United States for China during that period of time. According to those sources, I learned that Gartenlaub has taken the following trips outside of the United States:

   a.   August 2014:  three-day cruise to Mexico.

   b.   May to June 2014:  three-week trip to China.

   c.   April to May 2014:  two-week trip to China.

   d.   January to February 2014:  two-week trip to China.

   e.   May 2012 to June 2012:  ten-day trip to Israel.

   f.   August 2011:  one-week trip to Mexico.

   g.   May to June 2011:  ten-day trip to China.

   h.   October 2009:  three-week trip to China.

   i.   June 2008:  eleven-day trip to China.

   j.   July to August 2006:  three-week trip to Thailand.

   k.   June 2005:  one-week trip to Mexico.

   l.   August 2004:  one-week trip to Mexico.

   m.   June 2004:  one-week trip, returning from Jamaica.

   n.   August 2003:  one-week trip to Thailand.

   15.   Other records show that Gartenlaub crossed the U.S. border via a land crossing, although the complete details of his travel are not known from those records. For example:

   a.   On April 8, 2012, Gartenlaub entered the United States from Canada at the Peace Arch border crossing near Blaine, Washington.

   b.   On November 26, 2011, Gartenlaub entered the United States from Canada at the Niagara Falls border crossing.

c.   On March 8, 2009, July 20, 2007, June 9, 2007, June 1, 2007, June 18, 2006, and June 5, 2003, Gartenlaub entered the United States from Mexico at the San Ysidro border crossing.

d.   On November 30, 2008 and September 21, 2008, Gartenlaub entered the United States from Canada at the Highgate Springs border crossing in Vermont.

16.   I have also learned the following from the results of a pen register and trap and trace device obtained from carriers that service the cell phones used by Gartenlaub and by his wife, and from an analyst who has also reviewed those records:

a.   Between January 1, 2014 and August 21, 2014, Gartenlaub's cell phone was in contact with telephone numbers based in China eight times.

b.   Between January 1, 2014 and April 29, 2014, Gartenlaub's wife's cell phone was in contact with telephone numbers based in China seventy-eight times.

**F. Gartenlaub's Limited Ties to this District**

17.   I learned from my discussions with a Staff Operations Specialist and from my review of surveillance logs that Gartenlaub's wife lives with him in Laguna Hills, California.  I have also learned from a commercial database that Gartenlaub's father and brother each live outside of California within the United States.

18.   In addition to having sold his interest in real property, as noted above in paragraph 6, I have reviewed an e-mail message obtained from Gartenlaub's employer in which Gartenlaub e-mailed his wife in July 2014 about a temporary rental unit that was available from July 2014 until October 2014.  Gartenlaub wrote his wife that it

1  was "good enough while we look."  I have learned from my review of

2  surveillance logs and an affidavit in support of a warrant for the

3  search of Gartenlaub's residence that this is the address where

4  Gartenlaub currently resides.

5      19.  I have also reviewed an automated e-mail obtained pursuant

6  to a search warrant that Gartenlaub received in April 2013 from a

7  major global corporation displaying ten job openings that matched

8  Gartenlaub's search terms.  Those search terms contained words

9  related to the type of work being sought and were coupled with "AND

10 ShangHai," and all of the job positions sent to Gartenlaub in that e-

11 mail listed a location in Shanghai.  I have reviewed at least six

12 other similar e-mails from the same corporation listing different

13 numbers of positions available in Shanghai dating back to October

14 2012.

15     20.  I have also reviewed an e-mail obtained pursuant to a

16 search warrant that Gartenlaub sent to himself and his wife in which

17 he forwarded a job description and wrote "Another Shanghai job..."

18     21.  I have also reviewed an e-mail obtained pursuant to a

19 search warrant that Gartenlaub received in 2006 from his wife.  In

20 that e-mail, Gartenlaub's wife had forwarded Gartenlaub's curriculum

21 vitae to another global corporation in which she wrote that

22 Gartenlaub "seeks an appointment in Asia."

23     I declare under penalty of perjury under the laws of the United

24 States of America that the foregoing is true and correct and that

25 this declaration is executed at Los Angeles, California, on August

26 29, 2014.

27

28

ALEX S. YOO

9